## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SAMSUNG SDS AMERICA, INC.,<br><br>                      Plaintiff,<br><br>v.<br><br>PHYSIQ INC.,<br><br>                      Defendant. | Civil Action No. _____<br>(ECF Case)<br><br><br>**COMPLAINT** |

Plaintiff, Samsung SDS America, Inc. ("SDSA" or "Plaintiff"), by and through its attorneys, Fox Rothschild LLP, by way of its Complaint against defendant PhysIQ Inc. ("PhysIQ"), states as follows:

### PARTIES

1.      SDSA, a provider of cloud and digital logistics services, is a corporation organized under the laws of the State of California, with its principal offices located at 100 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660.

2.      PhysIQ, a healthcare company in the internet software and wearable technology industry, is a corporation organized under the laws of the State of Delaware, located at 1415 W. Diehl Road, Suite 150, Naperville, Illinois 60563.

### JURISDICTION AND VENUE

3.      The Court has diversity jurisdiction over the claims herein pursuant to 28 U.S.C. § 1332(a)(1), as the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

150565299.1

4.      Venue is proper pursuant to a contractual agreement between the parties to this action, and because a substantial part of the events and/or omissions giving rise to the claims herein occurred in this District, as set forth in 28 U.S.C. § 1391(b)(2).

## FACTS COMMON TO ALL COUNTS

5.      On or about May 28, 2017, SDSA and PhysIQ entered into an agreement pursuant to which the parties agreed that PhysIQ would purchase certain products from SDSA for distribution to PhysIQ's customers (the "Device Distribution Agreement"). A true and accurate copy of the Device Distribution Agreement is annexed hereto as **Exhibit A**.

6.      Section 10.A of the Device Distribution Agreement provided for an initial term of one (1) year, as follows:

> This Agreement shall be effective as of the Effective Date and shall remain in effect for an initial period of one (1) years. Thereafter, this Agreement may be renewed for subsequent one (1) year terms upon mutual written agreement of the Parties . . . [.]

7.      On or about February 11, 2020, SDSA and PhysIQ executed an amendment to the Device Distribution Agreement (the "Amendment"), whereby the parties acknowledged and agreed that they had continued to operate under the terms of the Device Distribution Agreement as if it had not expired. A true and accurate copy of the Amendment is annexed hereto as **Exhibit B**.

8.      The Amendment also operated to delete and replace Section 10.A of the Device Distribution Agreement as follows:

> This Agreement shall remain in effect for one (1) year from the Effective Date, and thereafter shall automatically renew for successive one (1) year periods, unless either party provides (60) days' notice of its intent not to renew or terminated [sic] as provided herein.

2

9.      Additionally, Section 4.C of the Device Distribution Agreement provides for the payment of attorneys' fees and costs in the event it becomes necessary to institute a collection proceeding for amounts invoiced to PhysIQ:

> Should it become necessary to institute collection proceedings for amounts invoiced to [PhysIQ] and unpaid following the applicable due date, [PhysIQ] shall pay all reasonable costs and expenses incurred by SDSA in connection with such proceedings, including without limitation all reasonable attorneys' fees, without regard to whether a suit is filed by SDSA.

10.     In accordance with Section 4.B of the Device Distribution Agreement, SDSA was to issue invoices for the products purchased by PhysIQ, and PhysIQ was required to pay all fees due to SDSA within thirty (30) days of receipt of an invoice.

11.     On April 25, 2022, SDSA issued invoice #C510141742 (the "Invoice") to PhysIQ in the amount of $892,473.75 in connection with PhysIQ's purchase of certain hardware from SDSA, specifically 5,000 Samsung Galaxy A10e smartphones.  A true and correct copy of the Invoice is annexed hereto as **Exhibit C**.

12.     PhysIQ failed to make full and timely payment of the Invoice to SDSA in accordance with the Device Distribution Agreement.

13.     On June 24, 2022, in a good faith effort to collect the outstanding balance owed by PhysIQ on the Invoice, SDSA agreed to an installment plan under which PhysIQ would make four (4) monthly payments of $75,000 from July to October 2022, followed by a single installment to SDSA for the remaining balance on the Invoice, by no later than November 2022.

14.     While PhysIQ thereafter remitted to SDSA five monthly payments of $75,000, PhysIQ failed to pay the remaining balance by November 2022 as agreed.

150565299.1

15.     On December 19, 2022, SDSA issued a letter to PhysIQ demanding payment of the outstanding balance on the Invoice, totaling $517,473.75, in addition to monthly interest at a rate of 1.5%, pursuant to the Device Distribution Agreement.

16.     As of January 2022, PhysIQ owed to SDSA a total outstanding balance of $601,294.01, inclusive of interest. Interest continues to accrue until the Invoice is paid in full.

17.     To date, PhysIQ has failed and refused to pay the balance due and owing to SDSA on the Invoice, plus interest, which remains outstanding.

<u>**COUNT I**</u>
**(Breach of Contract)**

18.     Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

19.     Pursuant to the Device Distribution Agreement, PhysIQ would purchase products from SDSA for distribution and sale to PhysIQ's customers in exchange for remuneration.

20.     SDSA consistently provided products to PhysIQ pursuant to the terms of the Device Distribution Agreement.

21.     PhysIQ breached its contract with SDSA by failing to pay SDSA for the products SDSA provided to PhysIQ pursuant to the Invoice.

22.     Despite SDSA's demands for payment, PhysIQ has failed and refused to make the required payments to SDSA pursuant to the Device Distribution Agreement.

23.     As a result of PhysIQ's breach, SDSA has incurred damages that were reasonably foreseeable by PhysIQ.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendant and provide the following relief:

a)     Compensatory damages, incidental damages and consequential damages;

b)      Costs, interest and reasonable attorneys' fees;

c)      Pre and post judgment interest; and

d)      Such other relief as the Court deems just and equitable.

## COUNT II
### (Unjust Enrichment)

24.     Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

25.     SDSA provided PhysIQ with products for distribution and sale to PhysIQ's customers.

26.     SDSA expected remuneration from PhysIQ for providing the products.

27.     PhysIQ has failed to provide SDSA with full compensation for providing the products for distribution and sale to PhysIQ's clients.

28.     As a result, PhysIQ has been unjustly enriched at SDSA's expense and detriment.

29.     Retention of the benefits bestowed upon PhysIQ without compensation to SDSA would be unjust.

30.     As a direct and proximate cause of PhysIQ's unjust enrichment, SDSA has suffered damages.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendant and provide the following relief:

a)      Compensatory damages, incidental damages and consequential damages;

b)      Costs, interest and reasonable attorneys' fees;

c)      Pre and post judgment interest; and

d)      Such other relief as the Court deems just and equitable.

5

150565299.1

## COUNT III
### (Account Stated)

31.     Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

32.     PhysIQ is a debtor to SDSA and SDSA has provided PhysIQ with statements of account and made numerous efforts to collect its debt.

33.     SDSA has on its accounts a book account balance for the Invoice, which remains due and owing.

34.     PhysIQ has failed to pay this book account balance, although it is presently due, owing, and duly demanded by SDSA.

35.     As a result, SDSA has incurred damages that were reasonably foreseeable to PhysIQ.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendant, and provide the following relief:

(a)     Judgment in Plaintiff's favor for compensatory damages, incidental damages, contractual liquidated damages and consequential damages;

(b)     Taxed costs, interest and reasonable attorneys' fees;

(c)     Pre-judgment interest; and

(d)     Such other relief as the Court deems just and equitable.

## COUNT IV
### (Breach of Duty of Good Faith and Fair Dealing)

36.     Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as though set forth at length herein.

37.     As a party to a contractual relationship, PhysIQ owed SDSA an implied duty of good faith and fair dealing.

6

38.     The implied duty of good faith and fair dealing provides that each party to a contractual relationship will not do anything that will deprive the other parties of the benefits of their bargain, and a breach of this duty gives rise to an action for damages.

39.     PhysIQ precluded SDSA from realizing the full benefit of its bargain under the Device Distribution Agreement.

40.     PhysIQ did so under circumstances evidencing PhysIQ's bad faith.

41.     As a result of PhysIQ's breach of the implied covenant of good faith and fair dealing, SDSA has suffered substantial damages.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in its favor and against Defendant and provide the following relief:

a)     Compensatory damages, incidental damages and consequential damages;

b)     Costs, interest and reasonable attorneys' fees;

c)     Pre and post judgment interest; and

d)     Such other relief as the Court deems just and equitable.

Dated: October 27, 2023

By: _____
**FOX ROTHSCHILD LLP**
Matthew S. Adams, Esq.
Daniel B. Cohen, Esq.
49 Market Street
Morristown, New Jersey
Tel: (973) 992-4800
*Attorneys for Plaintiff*

7

# EXHIBIT A

## DEVICE DISTRIBUTOR AGREEMENT

This Device Distributor Agreement (this "Agreement"), shall be effective May 28, 2017 (the "Effective Date"), is made by and between **Samsung SDS America, Inc.**, a California corporation with principal offices at 100 Challenger Road, 6th Fl., Ridgefield Park, NJ 07660 ("Samsung"), and physIQ Inc., a Delaware corporation located at 1415 W. Diehl Road, Suite 150, Naperville, IL 60563 (the "Distributor" and, together with Samsung, the "Parties").

WHEREAS, Samsung is the distributor of those certain device products set forth on Exhibit A (the "Products");

WHEREAS, Distributor desires to purchase Products from Samsung for distribution to Distributor's customers in the geographic area as described on Exhibit A (the "Territory");

WHEREAS, Samsung desires to sell Products to Distributor on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual promises and obligations set forth below in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each Party, the Parties hereby covenant and agree as follows:

1. **Purchase Orders.**

   **A. Issuance.** During the Term of this Agreement, which is defined in Section 10 (Term and Termination) below, Distributor may submit orders for Products (each, a "Purchase Order") to Samsung, specifying the Products (including the quantities thereof) to be delivered to Distributor, the dates for shipment of such Products by Samsung (the "Shipping Dates") and the authorized representative of Distributor placing such Purchase Order. All further references to a "Purchase Order" shall be considered a Purchase Order accepted by Samsung in accordance with sub-section 1.B (Acceptance) below, except to the extent the context is related to the procedures or mechanics of the acceptance or rejection of a Purchase Order (e.g. in sub-section 1.B (Acceptance), 1.C (Changes and Cancellations by Distributor), and 1.D (Changes and Cancellations by Samsung) below) or as clearly required by the context of such reference. Each Purchase Order shall be subject to the terms and conditions of this Agreement. In the event of a conflict between any term or provision of this Agreement and any Purchase Order, this Agreement shall control, and no provision of any Purchase Order or other written or verbal communication between the Parties shall be effective to add to or amend this Agreement except by a writing that is mutually manually signed by the Parties.

   **B. Acceptance.** No Purchase Order submitted to Samsung shall be binding upon Samsung until accepted by Samsung in writing (which may be provided via email), and notification from Samsung to Distributor shall be provided within five business days of the date the Purchase Order is received by Samsung. Such notice shall include Samsung's intent to fulfill, or not, all or part of the submitted Purchase Order and to meet, or not, the delivery date specified on the Purchase Order. Samsung reserves the right, to reject any Purchase Order received from Distributor. If Samsung fails to notify Distributor of its acceptance or rejection of a Purchase Order submitted by Distributor, such shall be deemed Samsung's rejection of such Purchase Order.

   **C. Changes and Cancellations by Distributor.** Distributor may make changes to Purchase Orders that have been submitted but have not yet been accepted by Samsung pursuant to sub-section 1.B (Acceptance). Distributor shall not be permitted to cancel or change any part of a Purchase Order previously accepted by Samsung.

   **D. Changes and Cancellations by Samsung.** Samsung may not cancel an accepted Purchase Order at any time nor may make substitutions and modifications to the design or specifications of the Products in an accepted Purchase Order without the written consent of Distributor's authorized representative set forth on, or in an amendment to, the Purchase Order.

**2.**   <u>Representations</u>.  As of the Effective Date and as of the date of each Purchase Order hereunder:

**A.**   *Formation; Authority*.  Distributor represents, warrants, and covenants that it is duly formed, validly existing and in good standing under the laws of the state of its formation; it has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and the applicable Purchase Order; the execution, delivery and performance of this Agreement and the applicable Purchase Order have been duly authorized by all requisite corporate action; and that this Agreement and the applicable Purchase Order constitutes the legal, valid and binding agreement of Distributor, enforceable against it in accordance with its terms.

**B.**   *Authorizations*.  Distributor represents, warrants, and covenants that it has or will obtain all authorizations, approvals, consents or permits required to perform its obligations under this Agreement under all applicable laws and regulations.

**C.**   *Experience; Independent Contractor*.  Distributor represents, warrants, and covenants that it is familiar with the Products; it is an independent contractor without any authority to act for or on behalf of Samsung, and all representations made and agreements executed by Distributor with any third party shall be Distributor's sole responsibility.

**D.**   *No Corruption*.  Each Distributor represents, warrants and covenants that it is fully aware of and will comply with, and in the performance of its obligations under this Agreement will not take any action or omit to take any action that would cause either Party to be in violation of, (i) U.S. Foreign Corrupt Practices Act, or, (ii) any other applicable anti-corruption laws, or (iii) any regulations promulgated under any such laws.  Distributor represents, warrants and covenants that neither it nor any of its employees or agents is an official or employee of any U.S. Government (or any department, agency or instrumentality of any government of the country's listed in the Territory), (each, an "<u>Official</u>").  Distributor further represents, warrants and covenants that, to its knowledge, neither it nor any of its employees has offered, promised, made or authorized to be made, or provided any contribution, thing of value or gift, or any other type of payment to, or for the private use of, directly or indirectly, any public official for the purpose of influencing or inducing any act or decision of the official to secure an improper advantage in connection with, or in any way relating to, (i) any government authorization or approval involving the other party in relation to this Agreement, or (ii) the obtaining or retention of business by the other party related to this Agreement. Distributor further represents, warrants and covenants that it will not in the future offer, promise, make or otherwise allow to be made or provide any such payment and that it will take all lawful and necessary actions to ensure that no such payment is promised, made or provided in the future by any of its employees concerning this Agreement.   For the avoidance of doubt, any violation of this sub-section 2.D (No Corruption) shall be deemed to be a material breach of this Agreement.

**E.**   *No Inducements*.   Distributor represents, warrants and covenants that neither it, nor any of its employees, have provided or offered, or will provide or offer, any illegal or improper bribe, kickback, payment, gift or anything of value (but excluding any reasonable and ordinary business entertainment or gifts of an unsubstantial value, that are customary in local business relationships and permitted by applicable law) to Samsung or any customer or their respective directors, officers, employees and representatives in connection with this Agreement, the applicable Purchase Order or any sale of Products hereunder.

**3.**   <u>Distributor Rights and Responsibilities</u>.

**A.**   *General*.  Distributor has no obligation to achieve any sales target for the Products. Distributor shall limit the sales of Products within the Territory only and it shall not knowingly sell Products to any person or entity that intends to sell the Products outside the Territory.  Distributor shall assume full responsibility for the marketing, sale and support of the Products.

**B.**   *Other Instruments*.  Prior to any distribution of the Products by Distributor and at other times during the Term upon Samsung's request, Distributor shall execute and deliver any further legal instruments and perform any acts that are or may become necessary to effectuate the purposes of this Agreement, as requested by Samsung.

**C.** *Sales to Customers*. Except as otherwise provided herein, Distributor shall be solely responsible for all aspects of the sale and distribution of the Products to its customers, including collecting payment, technical support, and, to the extent applicable, advance replacement of defective Products. As between the Parties, Distributor shall have sole responsibility to configure the Products to operate in any customer's networks.

**D.** *Forecasts*. Distributor shall provide to Samsung a rolling six (6) month forecast of Distributor's expected purchases of Products. On a calendar quarterly basis, Samsung shall provide Distributor with , to the extent known by Samsung at that time, notice of any changes to the design or specifications of the Products or changes planned for the production of the Products (e.g. end-of-sale, end-of-support, new releases, etc.) listed in Exhibit A. Samsung shall provide Distributor with quantity two (2) of the new hardware products and/or two (2) of the new software products, as applicable, to Distributor as soon as possible in advance of release for testing provided that Distributor pay the then current price for each such Product.

**E.** *Compliance with Laws*. Distributor shall comply at all times, at its own expense, with the provisions of all applicable federal, state, county and local laws, ordinances, regulations and codes, including procurement of any required permits or certificates, as required by law, as well as all non-U.S. laws, applicable to Distributor's performance of this Agreement and shall at all times refrain from engaging in any illegal or deceptive business practices. Should Distributor fail to timely procure any such permits, or certificates, then Samsung may terminate this Agreement in accordance with Section 10.D (Termination for Breach).. In the event, those certificates as necessary by the law of the Territory, additional permits or certificates are required by law of the Territory in relation to this Agreement, Samsung shall notify Distributor and Distributor shall be responsible for the procurement of the permits and certificates necessary for the distribution of the Product within the "Territory". Should Distributor fail to procure timely any such permits or certificates so identified by Samsung then shall be considered a material breach of this Agreement. Distributor acknowledges that any products, software or technical information disclosed under this Agreement may be subject to U.S. and non-U.S. export laws and regulations and (to the extent applicable) any use or transfer thereof must be made in compliance with such regulations. Distributor shall not transfer, directly nor indirectly, any product, technical data or software furnished under this Agreement to any country without first obtaining all required licenses or other governmental approvals and otherwise complying with all applicable export control laws. In the event Distributor becomes aware of any Product that (i) poses a health or safety issue, which could reasonably be considered to create a substantial risk of injury to the public; or (ii) violates any applicable law, Distributor shall immediately notify Samsung in writing, which writing shall include all information known by Distributor in respect of such issue or violation.

**F.** *Feedback*. Distributor shall promptly notify Samsung of any problems encountered regarding the function or operation of the Products, and shall inform Samsung of any resolutions or suggestions to address such problems or to otherwise modify, redesign or improve the Products. As between Distributor and Samsung, all Feedback (as defined in this sub-section below) resulting from this Agreement is the exclusive property of Samsung, and Distributor hereby assigns to Samsung all Feedback, at no cost to Samsung. "Feedback" shall mean any and all oral and written test results, error data, reports or other information, feedback or materials made or provided by Distributor or any customer, employee or agent of Distributor to Samsung or Samsung's designates, to the extent directly relating to the Products, any other Samsung products (released or unreleased) or any other Confidential Information disclosed to Distributor by Samsung hereunder, including without limitation, reports regarding the performance of the Products, feedback on product features and usability.

**4.** **Cost and Payment**.

**A.** *Prices*. Distributor shall pay Samsung for the Products in accordance with the prices reflected in Exhibit A or other pricing set forth in the Purchase Order. Distributor shall be responsible for all freight and handling charges, including insurance.

**B.** *Invoices*. Samsung shall issue invoices for the Products at the conclusion of inspection as set out in sub-section 5.B (Inspection and Acceptance) and Distributor's confirmation of receipt of conforming Products. Any advance payment agreed to in writing by the parties shall be invoiced upon acceptance by Samsung of the relevant Purchase Order. Distributor shall pay all fees due under this Agreement within thirty (30) days of receipt of invoice. Samsung may, in its sole discretion, grant written payment credits ("Payment Credits") to Distributor to account for such items as Samsung may determine. Such Payment Credits shall be applied as credit against invoices

issued pursuant to this sub-section 4.B (Invoices), and in no instance shall any such Payment Credit be deemed to entitle Distributor to any kind of cash refund or other distribution. If any such Payment Credit has not been used by Distributor within thirty (30) days of issuance, Samsung reserves the right, in its sole discretion, to apply all or part of such Payment Credit against any invoices issued hereunder.

**C.   *Late Payments*.** Payment terms shall be strictly enforced, and late payments shall be assessed monthly interest at the lesser of one and one-half percent (1.5%) or the maximum rate permitted by applicable law. Should Distributor fail to make timely payments hereunder, Samsung may, after providing ten days written notice, at its discretion, withhold or suspend further deliveries of Products, without limiting any other remedies it may have pursuant to this Agreement. Should it become necessary to institute collection proceedings for amounts invoiced to Distributor and unpaid following the applicable due date, Distributor shall pay all reasonable costs and expenses incurred by Samsung in connection with such proceedings, including without limitation reasonable attorney's fees, without regard to whether a suit is filed by Samsung.

**D.   *Taxes*.** All costs shall be paid in US Dollars and shall be exclusive of taxes. Any taxes, duties, excises or tariffs imposed on costs and fees paid under this Agreement shall be the responsibility of Distributor. Distributor shall indemnify, defend and hold Samsung harmless for any failure by Distributor to timely remit any taxes for which it has responsibility pursuant to this sub-section 4.D (Taxes). If Samsung is required by law to directly pay any such taxes, fees, excises, tariffs or other charges, Distributor shall promptly reimburse Samsung upon Samsung's presentation to Distributor of documentation evidencing such payment. Promptly after the date hereof, Distributor shall provide a resale tax exemption certificate to Samsung applicable to Distributor's purchases hereunder.

**5.   Delivery; Risk of Loss.**

**A.   *New Products and Original Packaging*.** All products to be delivered under this Agreement shall be new and in their original packaging. Unless otherwise expressly agreed by the Parties, Samsung shall arrange for shipment of the Products to Distributor; provided that any carrier selected by Samsung to make such shipment shall not be deemed to be an agent of Samsung. Nonetheless, Samsung shall remain liable for loss or other damage relating to the shipment until delivery to the address on the Purchase Order is confirmed. Notwithstanding anything to the contrary contained herein or in any Purchase Order, risk of loss or damage shall pass to Distributor, and delivery shall be deemed to be complete, upon tender of delivery of the Products to the shipping address specified on the Purchase Order. Samsung will meet scheduled Shipping Dates; provided that Samsung is expressly authorized by Distributor, at Samsung's discretion, to make early or incremental deliveries of the Products to be delivered under any Purchase Order. Distributor is solely responsible for delivery to its customers, and Samsung shall have no liability under this Agreement for any delivery to such customers.

**B.   *Inspection and Acceptance*.**

(i) Distributor shall inspect the Products that it receives at its dock, by removing any shrink wrap from each palette, for any shortage, or damage to, any master cartons contained on each palette, and if any such shortage, or damage, is found, then Distributor must so note such in detail in writing, on the bill of lading, and to the common carrier (such inspection, the "**Initial Inspection**"). To the extent that any such shortage, or damage, is so noted, Distributor shall notify Samsung in writing of the details of such within 24 business hours from receipt of the affected Products.

(ii) After the Initial Inspection, Distributor shall conduct a second more thorough inspection of the Products by removing each Product unit package from its master carton, and then removing each device from its unit package, and checking for any shortage, or damage to, any unit packages, or units, and if any such shortages or damages are found, Distributor must notify Distributor in writing of the details of such within 5 calendar days from receipt of the affected Products (such second inspection, the "**Second Inspection**").

(iii) Samsung shall validate any such notices and upon validation, Samsung shall undertake reasonable efforts to: (1) effect an exchange of damaged Products or provide additional Product shipments to the extent of any shortage. To the extent that Samsung complies with its obligations in this sub-section 5.B (Inspection and Acceptance), Samsung shall not be considered in breach of its obligations to provide non-damaged, or agreed to

quantities of, Products. For the avoidance of doubt, in no event shall Samsung be responsible for any damaged, or shortage of, Products after the applicable notice periods set forth above in this sub-section 5.B (Inspection and Acceptance). The Products shall not be subject to any express, or implied, rights of acceptance testing or rejection except as set forth in this sub-section 5.B (Inspection and Acceptance). The Product manufacturer's product warranties are addressed in Section 11 (Warranty).

**6.** **Proprietary Rights.**

   **A.** **Samsung's Rights.** Distributor acknowledges and agrees that Samsung, or its suppliers, owns, without limitation, all right, title and interest to all patent, copyright, trademark, trade name, trade secret and other intellectual property rights relating to the design, manufacture, operation or service of the Products and that Distributor shall not, by virtue of its purchase of the Products or otherwise, obtain any right, title or interest in or to such intellectual property rights other than as expressly authorized and only for the specific purposes set forth herein. Distributor acknowledges that the purchase of any Products by Distributor under this Agreement shall not convey any license, expressly or by implication, to manufacture duplicate or otherwise copy or reproduce any of the Products. Distributor shall take all necessary steps, as determined by Samsung in its sole discretion, to inform its resellers of Samsung's, or its suppliers', rights pursuant to this sub-section 6.A (Samsung's Rights) and to ensure compliance hereunder, and shall promptly notify Samsung upon Distributor's discovery of any infringement, or misappropriation, of Samsung's proprietary rights

   **B.** **Proprietary Marks.** On all copies of the Products, Distributor shall reproduce all copyright notices or other proprietary marks in a form approved by Samsung. Distributor may not, without the prior written consent of Samsung, co-brand or otherwise add any branding or marking to the Products *or their packaging*. In the event that Samsung so grants permission to Distributor the right to so co-brand or otherwise add any branding or marking to the Products or their packaging, then Distributor shall only undertake such in strict compliance with Samsung's brand guidelines set forth in Exhibit B (Brand Guidelines) Distributor may, during the Term, use the applicable trademarks and trade names for the Products as provided to Distributor by Samsung solely in furtherance of the sale, advertisement or promotion of the Products by Distributor, and Samsung hereby grants to Distributor a non-exclusive, non-transferable, revocable license to use such provided trade names and trademarks in the normal course of distributing and selling the Products hereunder and strictly in accordance with this Agreement and Samsung's then-current guidelines for such use; provided, however, that Distributor agrees not to use Samsung's name in any manner which would misrepresent the relationship between Distributor and Samsung. In the event that Samsung changes or ceases use of any of its marks licensed to Distributor under this sub-section 6.B (Proprietary Marks), for Products in Distributor's possession and control, Distributor shall promptly remove or cover and, if applicable, replace such mark upon Distributor's receipt of notice from Samsung of such change or cessation. Upon the earlier of (i) Samsung's written notice to Distributor or (ii) the termination of this Agreement, the license granted under this sub-section 6.B (Proprietary Marks) shall immediately terminate and Distributor shall promptly (i) cease use of all such trade names and trademarks; (ii) return or destroy, at Samsung's option, all marketing materials provided by Samsung to Distributor; and (iii) remove and destroy any other material, of any nature in Distributor's, identifying Distributor as a distributor of Samsung's products or otherwise displaying or using any such trade names or trademarks.

   **C.** **Limitation of Government Rights to Products and Clauses.**

   (i) Samsung does not accept any government flow-down provisions, including, without limitation, any provisions set forth in the Federal Acquisition Regulations, any agency supplement thereto, or any prime contract or higher-tier subcontract. Further, Samsung will not provide any government-required representations or certifications.

   (ii) Without limiting the sub-section 6.C (Limitation of Government Rights to Products and Clauses) (i), if the Products, or any portion thereof, are provided to a government agency or acquired pursuant to a government contract or government funds, Distributor shall ensure that Distributor's standard customer end user license is incorporated into all relevant proposals and contracts to ensure the terms and conditions that govern the use of the Products are made clear. All software included with the Products to be provided to Distributor is subject to Federal Acquisition Regulation (FAR) 52.227.19 Commercial Computer Software License. If the Products are provided to, or are acquired by, the United States Government or a government other than the United States, Distributor shall ensure that Samsung's rights, including intellectual property rights, in the software embedded in the Products are protected to the maximum extent possible, but in no event less than the standard of protection that Samsung would be afforded

under US laws and regulations. If the Distributor desires to provide, or desires to allow the Products to be provided via a third party, to a government other than the United States, then Distributor shall first consult with Samsung in writing regarding the extent to which Samsung's rights in the Products would be protected as compared to the standard of protection that Samsung would be afforded under US laws and regulations. Distributor shall only proceed with such direct, or indirect, provision of the Products upon the express prior written consent of Samsung. Compliance with this sub-section 6. C (Limitation of Government Rights to Products and Clauses), including the fulfillment of any government requirements to obtain such protection, is solely the responsibility and obligation of Distributor, and in no event shall Samsung be obligated to take any action to be afforded such protection hereunder.

**7.    Audits.**    Samsung may from time to time audit Distributor's records in order to verify Distributor's compliance with the terms and conditions of this Agreement with 10 business days advance notice to Distributor. Distributor agrees to provide reasonable cooperation.

**8.    Indemnity**.

**A.    *Indemnification by Distributor*.** Distributor agrees to indemnify, defend and hold harmless Samsung and Samsung's officers, suppliers, directors, employees, and agents from and against any and all losses, costs, liabilities or expenses (including but not limited to reasonable attorney's fees) arising  directly or indirectly out of or in connection with: (i) the possession, use, selection, distribution, delivery, resale, purchase or operation of the Products by Distributor or any of its customers; (ii) the willful or negligent acts or omissions of Distributor or any of its customers; (iii) Distributor's failure to submit or accurately complete any form or document required pursuant to sub-section 3.B (Other Instruments); (iv) any modification or supplementation by Distributor of the warranties made by Samsung pursuant to Section_11 (Warranty); (v) Distributor's breach of this Agreement, or any of Samsung's policies and procedures referenced herein, to the extent giving rise to a third party claim, (vi) Distributor's breach of its representations set forth in Section 2 (Representations) ; (vii) Distributor's use of or combination of Samsung's marks licensed to it under sub-section 6.B (Proprietary Marks) or the Products in a manner that infringes upon any third party's intellectual property rights, to the extent that the infringement would not have arisen absent such use or combination by Distributor; (viii) any claim that any of the marks, logos, or other material provided by Distributor to Samsung, if any, infringes or misappropriates any patent, copyright, trade secret or other proprietary right of any third party; (ix) any claim or action brought by Distributor's customer against Samsung, or Samsung's suppliers, that would have been covered, or addressed, by the Product's manufacturer's product warranty had Distributor provided its customer with the Product's manufacturer's product warranty (this sub-clause; (x) shall be referred to as the "No Manufacturer Product Warranty Pass Through Indemnity"); and (xi) arising from integration of the Products by Distributor, or its customers, into any other product or any other product's integration by Distributor, or its customers, into the Product, *provided that* Samsung (a) grants Distributor sole control over the defense and settlement thereof pursuant to sub-section 8.C (Indemnification Procedures); and (b)  cooperates with any reasonable request by Distributor for assistance in defending such claim.  Distributor's obligation to indemnify Samsung under the No Manufacturer Product Warranty Pass Through Indemnity above shall also apply to Distributor's suppliers.

**B.    *Indemnification by Samsung*.** Samsung shall indemnify, defend and hold Distributor harmless from and against any and all losses, costs, liabilities or expenses (including but not limited to reasonable attorney's fees) arising from a third party claim that a Product infringes a US patent or copyright, provided that Distributor (i) promptly notifies Samsung in writing of such claim; (ii) grants Samsung sole control over the defense and settlement thereof pursuant to sub-section 8. C (Indemnification_Procedures); and (iii) cooperates with any request by Samsung for assistance in defending such claim.  Should any Product become, or in Samsung's opinion be likely to become, the subject of such a claim, Samsung may, at its option and expense, (i) procure for Distributor the right to make continued use thereof, whether through obtaining a license or some other means; (ii) replace or modify such Product so that it becomes non-infringing; or (iii) request return of the Product by Distributor and refund the price paid by Distributor for such Product  less straight line depreciation based on a two (2) year useful life. Samsung shall have no liability under this sub-section 8. B (Indemnification by Samsung) for any alleged infringement based, in whole or in part, on (i) any combination of the Products with Distributor or third party products; (ii) the use of the Products for a purpose or in a manner for which a Product was not intended or designed; (iii) use of an older version of any Product when use of a newer version would have been non-infringing; (iv) any modification made to the Products without Samsung's express written approval; (v) modifications made by Samsung pursuant to Distributor's instructions or request; (vi) any intellectual property right owned or licensed by Distributor or its resellers, or any of their respective subsidiaries or affiliates; or (vii) compliance with designs, plans or specifications of Distributor or its resellers.  THE

FOREGOING CONSTITUTES SAMSUNG'S ENTIRE LIABILITY AND DISTRIBUTOR'S SOLE AND EXCLUSIVE REMEDY FOR ANY INFRINGEMENT CLAIM ARISING HEREUNDER.

        **C.** *Indemnification Procedures.* Promptly after receipt by either Party (in each case, an "Indemnitee") of notice of the commencement or threatened commencement of any action or proceeding involving a claim in respect of which Indemnitee is entitled to indemnification under this Section 8 (Indemnity), Indemnitee shall notify the other Party (in such instance, the "Indemnitor") of such claim. No delay or failure to so notify Indemnitor shall relieve Indemnitor of its obligations under this Agreement except to the extent that Indemnitor has suffered actual prejudice by such delay or failure. Within five (5) days following receipt of notice from Indemnitee relating to any claim, but no later than fifteen (15) days before the date on which any response to a complaint or summons is due, if applicable, Indemnitor shall notify Indemnitee that Indemnitor shall assume control of the defense and settlement of such claim (a "Notice of Assumption"). If Indemnitor delivers a Notice of Assumption within the required notice period, Indemnitor shall assume control (subject to Indemnitee's right to participate at Indemnitee's cost and expense) over the defense and settlement of the claim and diligently defend the claim; provided, however, that (i) Indemnitor shall keep Indemnitee fully apprised as to the status of the defense; and (ii) Indemnitor shall obtain the prior written approval of Indemnitee before entering into any settlement of such claim asserting any liability against Indemnitee, imposing any obligations or restrictions on Indemnitee, ceasing to defend against such claim or otherwise adversely impacting Indemnitee. If Indemnitor does not deliver a Notice of Assumption relating to any claim within the required notice period, or if, after the assumption of the defense by Indemnitor, Indemnitor has failed to defend the claim diligently, Indemnitee shall have the right to defend the claim in such manner as it may deem appropriate. Indemnitor shall promptly reimburse Indemnitee for all reasonable costs and expenses incurred by Indemnitee, including attorney's fees, in connection therewith to the full extent of Indemnitor's indemnification obligation under this Section 8 (Indemnity).

        **9.** **Confidentiality**

        **A.** *General.* The Parties acknowledge that, in the course of their performance of their obligations and enjoying their rights under this Agreement, each will be exposed to the Confidential Information of the other. For purposes of this Section 9 (Confidentiality), the party disclosing Confidential Information shall be referred to as the "Disclosing Party" and the party receiving Confidential Information shall be referred to as the "Receiving Party".

        **B.** *Definition.* "Confidential Information," as used in this Agreement, shall mean all non-public information of the Disclosing Party, including, but not limited to, information concerning this Agreement and its terms, the products, services, sales, performance, plans, strategies, customers, financial or human resources, processes, management, contracts, project documentation, software and hardware, technical data, drawings, schematics, know-how, ideas, inventions, customer data and information, trade secrets, patents, specifications, know-how, designs, drawings, sketches, models, notes, documents, samples, reports, plans, forecasts, methods of doing business, current or historical data, computer software and programs, codes, and all other technical, financial, or business information (whether patentable or not) of the Disclosing Party, and such of its affiliated companies, parents and subsidiaries as may be appropriate, and any third party proprietary information given to the Receiving Party by or through the Disclosing Party. *SDSA's Confidential Information shall include the Product, this Agreement, and its terms.* Confidential Information may be in writing, oral, visual, or in other tangible, or intangible, form. Confidential Information shall be marked, or otherwise identified, as confidential or proprietary, or consist of information which reasonably should be considered as confidential or proprietary from its nature or from the circumstances surrounding its creation or disclosure. Disclosing Party's Confidential Information shall also include (i) the confidential information of its affiliates, subsidiaries, parent, and third parties, for which Disclosing Party is obligated to hold in confidence, and (ii) confidential information of Disclosing Party disclosed to Receiving Party on behalf of Disclosing Party by Disclosing Party's affiliates, subsidiaries, parent, consultants, or agents, provided that such information as described in sub-clauses (i) and (ii) of this sentence would otherwise fall within the definition of Confidential Information set forth in this Section (Confidentiality).

        **C.** *Strict Confidence.* The Receiving Party shall hold and keep in strict confidence, and protect from unauthorized disclosure or use, all Confidential Information of the Disclosing Party, including using the same means it uses to hold in confidence, and protect, its own Confidential Information, but in any event not less than reasonable care. The Receiving Party shall in particular restrict the location of Confidential Information to areas of restricted access and store such Confidential Information in a manner that is reasonably designed to prohibit unauthorized

access. Receiving Party shall make use of the Confidential Information only for the purpose of performing its obligations under this Agreement. Receiving Party shall not disclose Confidential Information, whether directly or indirectly, to any third party without prior written approval of the Disclosing Party. Receiving Party agrees that it (and that its employees, affiliates or agents) shall not reverse-engineer, decompile or disassemble any part of, or remove any proprietary marking from, Disclosing Party's Confidential Information.

   **D.** *Exclusions.* Confidential Information shall not include any information to the extent that it: (i) is made public by the Disclosing Party, or is in the public domain otherwise than as a result of a breach of this Agreement; (ii) was in the possession of the Receiving Party without an obligation of confidentiality before its receipt of the Confidential Information whether directly or indirectly from the Disclosing Party, as evidenced by the Receiving Party's written records; (iii) is disclosed to the Receiving Party in good faith by a third party who had a lawful right to make such disclosure without breach of any confidentiality obligation; or (iv) is independently developed by Receiving Party without use of the Confidential Information as evidenced by the Receiving Party's written records.

   **E.** *Government Orders.* The Receiving Party may make disclosures of Confidential Information, to the minimum extent legally required, in accordance with a judicial or other governmental order, provided the Receiving Party shall: (i) give Disclosing Party reasonable written notice prior to disclosure pursuant to such order (unless prohibited by such order); (ii) use diligent efforts to limit disclosure and to obtain confidential treatment, or a protective order, and allow the Disclosing Party to participate in the proceedings; and (iii) comply with any applicable protective order or equivalent. Confidential Information disclosed pursuant to this sub-section 9.E (Government Orders) shall itself be considered Confidential Information.

   **F.** *Notification.* The Receiving Party shall, upon knowledge of any unauthorized disclosure, failure to hold in confidence, misappropriation or misuse, of any Confidential Information, immediately inform the Disclosing Party in a writing containing reasonable details about the unauthorized act or omission.

   **G.** *Return Requests.* Upon written request by and at the election of the Disclosing Party at any time, the Receiving Party shall, within fifteen (15) days from the date of such request, return or destroy all Confidential Information of the Disclosing Party to the Disclosing Party and all documents containing any such Confidential Information and any and all copies or extracts thereof. Receiving Party shall also, at the same time, remove and delete all electronic copies of such Confidential Information from all storage media and furnish written verification of such complete removal and deletion to the Disclosing Party.

   **H.** *Derivative Information.* All information developed, compiled or otherwise derived by the Receiving Party from the Confidential Information ("Derivative Information") shall be deemed Confidential Information. The obligations in this Section (Confidentiality) extend to the Derivative Information. Any copies, reproductions, or reductions to writing, of Confidential Information shall be the property of Disclosing Party.

   **I.** *No Rights Transfer.* Nothing in this Section (Confidential Information) is intended to nor shall be construed as conferring on the Receiving Party, whether expressly or by implication, any rights in or to any Confidential Information of the Disclosing Party, other than the limited rights to utilize such Confidential Information for the purpose of performing its obligations under this Agreement. All other rights, including but not limited to all industrial and intellectual property rights, shall remain fully vested in the Disclosing Party, or such other third party disclosing Confidential Information through the Disclosing Party, as the case may be.

   **J.** *Equitable Relief.* The Receiving Party agrees and acknowledges that the Confidential Information of the Disclosing Party constitutes valuable proprietary information for which there can be no adequate remedy at law for any breach of this Section (Confidential Information), which breach may result in irreparable harm to the Disclosing Party. The Receiving Party therefore agrees that upon any such breach or threatened breach of the provisions of this Section (Confidential Information), the Disclosing Party shall be entitled, in addition to any other remedies it may have at law or in equity, to obtain injunctive, prohibitory or other urgent relief against such breach or threatened breach and the Receiving Party shall not plead as a defense to such action by the Disclosing Party that the Disclosing Party has an adequate remedy or other remedies at law.

   **10.** <u>**Term and Termination**</u>.

Case 2:23-cv-21593-WJM-MAH   Document 1   Filed 10/27/23   Page 17 of 30 PageID: 17

**A. Term.** This Agreement shall be effective as of the Effective Date and shall remain in effect for an initial period of one (1) years. Thereafter, this Agreement may be renewed for subsequent one (1) year terms upon mutual written agreement of the Parties (collectively, with the initial period, the "Term").

**B. Termination for Convenience.** Either party may terminate this Agreement for convenience upon thirty (30) days written notice to the other. Distributor may also terminate this Agreement for convenience upon thirty (30) days written notice to Samsung if Samsung for any reason to ceases to function in the ordinary course of business as a distributor of the Products.

**C. Termination for Insolvency.** Samsung may immediately terminate this Agreement by written notice to Distributor if (i) the Distributor shall become insolvent or make a general assignment for the benefit of creditors; (ii) the Distributor files a petition for bankruptcy or has filed against it a petition for bankruptcy which is not dismissed *within twenty (20) days*; or (iii) the Distributor proposes any dissolution or becomes involved in legal, financial or reorganization proceedings that, in the opinion of the concerned party, interfere with the diligent performance and satisfactory completion of the obligations hereunder.

**D. Termination for Breach.** Samsung may terminate this Agreement, or any Purchase Order hereunder, in Samsung's sole discretion, immediately upon thirty (30) days written notice to Distributor (i) in the event that Distributor is in material breach or default and Distributor has failed to cure such breach or default (if curable) by the end of such notice period; (ii) the failure of Distributor for any reason to function in the ordinary course of business as a distributor; or (iii) conduct by Distributor which, in Samsung's sole discretion, is illegal, unethical or poses a business or reputational risk to Samsung. Distributor may terminate this Agreement, upon forty five (45) days written notice to Samsung (iv) in the event that Samsung is in material breach or default and Samsung has failed to cure such breach or default (if curable) by the end of such notice period.

**E. Obligations Upon Termination.** In the event of any expiration of this Agreement or termination by either party under this Section 10 (Term and Termination), except as may be mutually agreed in writing, each party shall perform its obligations under this Agreement so as to effect the performance of any accepted, but not yet fully performed, Purchase Orders as if this Agreement was not so terminated, but only as to such Purchase Order, prior to the effective date of such termination, and in particular, such post-termination obligations of performance of such Purchase Orders shall include Samsung effecting delivery of the Products covered by such Purchase Order, and Distributor shall accept delivery of, and inspect, such Products and promptly pay for all amounts invoiced accordingly for such Products.

**F. Survival.** Any provision of this Agreement that contemplates performance or observance subsequent to any termination or expiration of this Agreement, including, without limitation, Sections 3.F (Feedback), 4 (Cost and Payment), 6.A (Samsung's Rights), 6.C (Limitation of Government Rights to Products and Clauses), 7 (Audits), 8 (Indemnity), 9 (Confidentiality), 10.E (Obligations Upon Termination), 10.G (No Liability For Termination), 11 (Warranty), 12 (Returns), 13 (Limitation of Liability), 14 (Force Majeure), 15.D (Governing Law; Jurisdiction; Waiver of Immunity), 15.G (Interpretation) and 15.H (Entire Agreement; Amendment; Cumulative Remedies; Severability), shall survive any termination or expiration of this Agreement and continue in full force and effect.

**G. No Liability For Termination.** Samsung shall not be liable to Distributor for any damages or liabilities whatsoever, including, without limitation, damages for lost profits or loss of business, arising out of the termination of this Agreement for any reason or for no reason whatsoever.

**11. Warranty.**

**A. Manufacturer's Limited Warranty.** To the extent that the Product manufacturer, Samsung Electronics, an affiliate of Samsung SDS America, provides a transferable manufacturer's product warranty for the Product, such then-current Product manufacturer's product warranty shall be transferred by SDSA to Distributor. Distributor shall also transfer such then-current Product manufacturer's product warranty to Distributor's Product customers. Distributor shall not provide to any person, or entity, any product warranty information for, or any warranties in respect of, the Products not then-authorized in writing by the Product manufacturer. Manufacturer's product warranty service procedures shall be as provided in manufacturer's then current product warranty document

v20170502 0813 – Device Resale          Page 9 of 15          SDSA Confidential

applicable to the Product. For added clarity and without limiting the foregoing in this Section 11 (Warranty), neither the Product manufacturer, nor Samsung, shall have any liability to Distributor for (i) any claim arising, in whole or in part, from the incorrect use, misuse, faulty maintenance, improper handling, storage or installation of any Product or any use of a Product for a purpose for which such Product was not intended or designed; (ii) any Product that has been altered, modified, repaired or otherwise had parts replaced by any person other than the Product manufacturer or a Product manufacturer authorized repair facility; or (iii) any damages due to fire, explosion, accident, power irregularities or surges, acts of God or nature or any other cause not wholly or directly attributable to Samsung. Distributor acknowledges that Samsung is not the Product manufacturer. SAMSUNG ITSELF MAKES NO WARRANTY AS TO THE QUALITY OR PERFORMANCE OF THE PRODUCT.

THE FOREGOING CONSTITUTES SAMSUNG'S ENTIRE LIABILITY, AND DISTRIBUTOR'S, AND ANY THIRD PARTY'S, SOLE AND EXCLUSIVE REMEDY FOR ANY BREACH OF ANY WARRANTY CLAIM ARISING UNDER OR RELATED TO THIS AGREEMENT.  IN NO EVENT SHALL SAMSUNG BE LIABLE FOR THE COST OF PROCUREMENT OF SUBSTITUTE GOODS BY DISTRIBUTOR OR FOR ANY INDIRECT, SPECIAL, CONSEQUENTIAL, OR INCIDENTAL DAMAGES, FOR BREACH OF ANY WARRANTY.

**B.  *Disclaimer of Product Warranties*.** EXCEPT AS EXPRESSLY PROVIDED IN THE THEN CURRENT MANUFACTUER'S PRODUCT WARRANTY AND   THIS SECTION 11 (WARRANTY), SAMSUNG PROVIDES THE PRODUCTS ON AN "<u>AS IS</u>," "<u>WHERE IS</u>" BASIS AND MAKES NO OTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO THE PRODUCTS PROVIDED OR THE INFORMATION DISCLOSED HEREUNDER, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT.  FURTHER, SAMSUNG DOES NOT WARRANT THAT THE PRODUCTS WILL MEET DISTRIBUTOR'S OR ANY THIRD PARTY'S REQUIREMENTS OR THAT THE OPERATION OF THE PRODUCTS WILL BE UNINTERRUPTED OR ERROR-FREE.

**12.  <u>Returns</u>.** Except with respect to Products that are received damaged as under Section 5 B (Inspection and Acceptance), there shall be no right granted to any person to return to Samsung any Products purchased by Distributor under this Agreement.

**13.  <u>Limitation of Liability</u>.** IN NO EVENT  SHALL SAMSUNG BE LIABLE TO DISTRIBUTOR, OR ANY THIRD PARTY, FOR ANY INDIRECT, PUNITIVE, SPECIAL, CONSEQUENTIAL, INCIDENTAL, EXEMPLARY, LOST PROFIT, OR OTHER SIMILAR DAMAGES, ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL SAMSUNG'S TOTAL AGGREGATE LIABILITY FOR DIRECT DAMAGES UNDER OR IN CONNECTION WITH THIS AGREEMENT, REGARDLESS OF THE FORM OF THE ACTION OR THE THEORY OF RECOVERY, EXCEED AN AMOUNT EQUAL TO THE AMOUNTS PAYABLE BY DISTRIBUTOR TO SAMSUNG FOR THE PRODUCT GIVING RISE TO THE ACTION OR CLAIM.

**14.  <u>Force Majeure</u>.** Samsung shall not be held responsible for any delay or failure in performance of any part of this Agreement to the extent such delay or failure is attributable to a force majeure event, including without limitation: fires, floods, riots, work stoppages, weather, acts of God, war, terrorism or delays arising from compliance with any law or government regulation, or other similar causes beyond its control, and without the fault or negligence of Samsung or its subcontractors or suppliers.

**15.  <u>Miscellaneous</u>.**

**A.  *Notices*.** All notices, demands and other communications shall be in writing and shall be deemed to have been given if delivered personally, or three days after mailing by certified mail (return receipt requested) or overnight carrier to the respective addresses listed above or to such other address as either Party may designate by providing notice in accordance with this sub-section 15.A (Notices).  For purposes of this Agreement, send to: Samsung SDS America, Inc., 100 Challenger Rd., Fl. 6, Ridgefield Park NJ 07660, Attn: Legal Department.

**B.  *Assignment; No Third Party Beneficiaries*.** Distributor may not assign its rights or delegate its obligations under this Agreement without the prior written consent of Samsung. Any attempted assignment or

delegation in violation of this sub-section 15.B (Assignment; No Third Party Beneficiaries) shall be void. Any permitted assignee or successor of a Party's rights and obligations under this Agreement shall be bound by all terms and conditions of this Agreement.  Except to the extent expressly set forth in this Agreement, this Agreement shall not be deemed to confer any rights or remedies upon any person or entity not a Party hereto.

**C.  *Independent Contractor*.** The relationship between the Parties under this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to create a relationship of employer and employee or principal and agent between Distributor and Samsung nor shall it be deemed a partnership, joint venture or fiduciary relationship for any purpose.  Distributor's personnel shall serve under the exclusive direction and control of Distributor and shall not be deemed to be employees or agents of Samsung. Distributor shall be solely responsible for payments of all such personnel's compensation, including wages, benefits, taxes, workers' compensation, disability, and other insurance and the withholding or deduction of such items to the extent required by applicable law.

**D.  *Governing Law; Jurisdiction; Waiver of Immunity*.** THIS AGREEMENT WILL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW JERSEY, EXCLUDING THE PRINCIPLES OF CONFLICT OF LAWS THEREOF THAT WOULD CAUSE THE LAWS OF ANOTHER JURISDICTION TO APPLY.  THE PARTIES HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF THE FEDERAL AND STATE COURTS IN NEW JERSEY, AND AGREE THAT ANY ACTION, SUIT OR PROCEEDING CONCERNING, RELATED TO OR ARISING OUT OF THIS AGREEMENT SHALL BE HEARD AND DETERMINED IN THE FEDERAL AND STATE COURTS IN NEW JERSEY, AND FURTHER IRREVOCABLY WAIVE ANY OBJECTION WHICH THEY MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH DISPUTE BROUGHT IN SUCH COURT OR ANY DEFENSE OF INCONVENIENT FORUM FOR THE MAINTENANCE OF SUCH DISPUTE.  BOTH PARTIES AGREE TO WAIVE TRIAL BY JURY FOR ALL CLAIMS ARISING HEREUNDER.  The Parties acknowledge and agree that the transactions contemplated under this Agreement are commercial in nature, and the Parties expressly and irrevocably waive (i) any claim or right which the Parties may have to immunity (whether sovereign immunity or otherwise) for the Parties or with respect to any of the Parties' assets in connection with any legal action, award or other proceedings to enforce this Agreement, including, without limitation, immunity from service of process, immunity of any of the Parties' assets from pre- or post-judgment attachment or execution and immunity from the jurisdiction of any court or tribunal; and (ii) service of process pursuant to the Hague Convention.

**E.  *Convention on Sale of Goods*.** The Parties acknowledge and agree that the Uniform Computer Information Transactions Act and the United Nations Convention on Contracts for the International Sale of Goods do not and will not apply to this Agreement or the transactions contemplated herein.

**F.  *Nonexclusivity*.** Distributor agrees and acknowledges that this Agreement does not grant any exclusive rights to Distributor in the Products or the Territory, and Distributor agrees and acknowledges that Samsung may, or may contract with other third parties to, evaluate, sell, manufacture and distribute the Products.

**G.  *Interpretation*.** This Agreement has been negotiated by the Parties and their respective counsel, and shall be interpreted in accordance with its terms and without any strict construction in favor of or against either Party. The section headings in this Agreement are included for convenience only and shall not limit or otherwise affect the interpretation of any of the terms or provisions herein.

**H.  *Entire Agreement; Amendment; Cumulative Remedies; Severability*.** Except as otherwise provided herein, this Agreement, including all exhibits, each of the Samsung policies attached hereto and the Purchase Orders accepted by Samsung under Section 1 (Purchase Orders), constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior verbal or written agreements.  No terms or conditions stated in a Distributor-issued purchase order, a Distributor-issued Purchase Order, or a Distributor-issued order documentation, shall be incorporated into, or form, any part of this Agreement, and all such terms and conditions shall be considered rejected by SDSA and shall be null and void.  No waiver or modification of this Agreement will be binding upon either Party unless made in writing and signed by duly authorized representatives such Party, and no failure or delay in enforcing any right will be deemed a waiver of such right.  If any term or provision of this Agreement shall be found to be illegal or unenforceable, such illegal or unenforceable provision will

be deemed modified to the limited extent required to permit its enforcement in a manner most closely approximating the intention of the Parties expressed herein.

**[Signature page follows]**

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**SAMSUNG SDSA AMERICA, INC.**

SDSA LEGAL DEPT
APPROVED AS TO LEGAL FORM
SAMSUNG SDS AMERICA   Digitally signed by Tasneem Karim Date: 2017.06.02 15:30:44 -04'00'

By: _____

Name: MINGU LEE

Title: VICE PRESIDENT

Date: 6/2/2017

By: _____

Name: Gary Conkright

Title:  CEO

Date: May 28, 2017

**EXHIBIT A**

**1. Products**

Products and pricing will be provided to Reseller on a case by case basis

**2.  Territory. ___**

     **Canada**

     **European Union**

**EXHIBIT B**

**Brand Guidelines**

Samsung's standard guidelines to be provided to Distributor.

# EXHIBIT B

## AMENDMENT TO THE DEVICE DISTRIBUTOR AGREEMENT

This **Amendment to Device Distributor Agreement** (this "**Amendment**") shall be effective on February 11, 2020 (the "**Amendment Date**"), by and between **Samsung SDS America, Inc.**, a California corporation, with its principal office located at 100 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660 ("**Samsung SDSA**") and **PhysIQ, Inc.**, a Delaware corporation with its principal place of business located at 1415 W. Diehl Road, Suite, 150, Naperville, Illinois 60563 (the "**Distributor**"). Defined terms used but not defined in this Amendment shall have the meanings set forth in the Reseller Agreement.

WHEREAS, the parties entered into that certain Device Distributor Agreement dated May 28, 2017 (the "Agreement").

WHEREAS, the Reseller Agreement expired by its terms on May 27, 2018; and

WHEREAS, the parties have continued since that time to operate under the terms of the Agreement as if it had not expired, and hereby desire to reinstate the Agreement and ratify all actions taken by them under the Agreement since May 28, 2019; and

NOW, THEREFORE, in consideration of the foregoing, the mutual promises and understandings of the parties set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as set forth in this Amendment.

1   Additional Terms

   1.1   Subsection 10.A of Section 10 (Term and Termination) of the Agreement is hereby deleted in its entirety and replaced with the following:

      "This Agreement shall remain in effect for one (1) year from the Effective Date, and thereafter shall automatically renew for successive one (1) year periods, unless either party provides (60) days notice of its intent not to renew or terminated as provided herein."

2. Reaffirmation. If and to the extent the terms and provisions of this Amendment contradict or conflict with the terms and provisions of the Agreement, the terms and provisions of this Amendment shall govern and control; provided, however, to the extent the terms and provisions of this Amendment do not contradict or conflict with the terms and provisions of the Agreement, the Agreement, as amended by this Amendment, shall remain in effect.

3. Construction. The Agreement as amended by this Amendment, constitutes the entire agreement and understanding of the parties with respect to the subject matter thereof and hereof, and supersedes all prior and contemporaneous agreements verbal and written agreements and understandings between the parties hereto.

4. Signatures. This Amendment may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Any signed copy of this Amendment copied or reproduced and transmitted via photocopy, facsimile or other process that accurately transmits the original document shall be considered an original document.

IN WITNESS WHEREOF, the parties cause this Amendment to be executed by their duly authorized representatives identified below.

| Samsung SDS America, Inc. | PhysIQ, Inc. |
|---|---|
| By: _____ | By: _____ |
| Name: **Mingu Lee** | Name: Edmund S. Fleming Jr. |
| Title: **Senior Vice President** | Title: CFO |
| Date: 2/27/2020 | Date: 2.17.20 |

*(Samsung SDS America digital approval stamp: "Digitally signed by SDS Legal Department Reason: Approved as to legal form (PH) Date: 2020.02.11 11:49:04 -05'00'")*

OA2020028589 PhysIQ, Inc. Device Distributor Amendment

# EXHIBIT C

                    **INVOICE**                                    1/1

**SAMSUNG SDS AMERICA, INC.**
**100 Challenger Rd. 6th fl.**
**Ridgefield Park, NJ 07660**
**Tel) 1-201-393-3415**
**Fax) 1-201-229-4117**

**Bill to :**
PhysIQ
200 West Jackson Blvd, Ste 550
Chicago, IL 60606

| | | |
|---|---|---|
| **Invoice No.** | : | C510141742 |
| **Invoice Date** | : | 4/25/2022 |
| **Customer No.** | : | A2008491 |
| **Due Date** | : | 5/25/2022 |
| **Customer PO No.** | : | 20190434 |
| **BO Code** | : | SDS-21202560 |

**Ship to :**
PhysIQ
200 W Jackson Blvd, Ste 550
Chicago, IL 60606

| | | |
|---|---|---|
| **Bank Information** | : | |
| Bank Of America (Fort Lee) | | |
| 1357 16th Street. Fort Lee, NJ 07024 | | |
| Account No. | : | 3810-3876-8813 |
| Swift Code | : | BOFAUS3N |
| ACH ABA No. | : | 0212-0033-9 |

| Description | Qty | Unit Price | Amount | Currency |
|---|---|---|---|---|
| SM-A102UZKAXAA  Samsung Galaxy A10e (Unlocked) | 5000 | 161.9 | 809,500.00 | USD |

| | | | | |
|---|---|---|---|---|
| **Net Total** | : | | 809,500.00 | |
| **Tax** | : | IL 10.25% sales tax | 82,973.75 | |
| **Total Amount** | : | | 892,473.75 | |
| **Comment** | : | | | |

---------------------------------------------------------------------------------------------------------------------------------

**EXHIBIT D**

DocuSign Envelope ID: CF8CFCB7-04B3-4F26-B70D-8310F1642225

**SAMSUNG SDS AMERICA, INC.**

100 Challenger Road, 6th FL., Ridgefield Park, NJ 07660

*__VIA FEDEX__*

physIQ Inc.
200 W Jackson Blvd, Suite 550
Chicago, IL 60606

December 19, 2022

RE:     **PAST DUE AMOUNTS OWED TO SAMSUNG SDS AMERICA, INC.**

Dear Mr. Gary Conkright:

Reference is made to the Device Distributor Agreement, dated May 28, 2017 (as amended from time to time, the "**Agreement**"), between Samsung SDS America, Inc. ("**we**", "**us**", "**our**", or "**SDSA**") and physIQ Inc. ("**you**", "**your**" or "**Distributor**").

This letter is being sent to you regarding the outstanding balance of **__$517,473.75__** that is owed by Distributor to SDSA under the Agreement.

In addition to the outstanding balance, pursuant to Section 4(C) (Late Payments) of the Agreement, default interest began to accrue from June 2022, and shall continue to accrue until payment of all amounts due is paid in full, together with accrued interest. As of the date of this letter, after accounting for partial payments made, accrued interest totals **__$66,179.34__**. Additional interest of $8,754.80 will accrue on December 25, 2022.

As you are well aware, Distributor's outstanding balance originates from Invoice #C510141742, dated April 25, 2022, for the amount of $892,473.75. Distributor failed to meet the 30-day due date. Pursuant to an installment plan to which Mr. Edmund Fleming agreed on Distributor's behalf via email dated June 24, 2022, SDSA acknowledges receipt of four (4) payments of $75,000 from July to October 2022. However, as of the date of this letter, Distributor has failed to keep its promise to pay, in a single payment by no later than November 2022, the remaining balance following the four (4) installments. Instead, Distributor remitted an additional payment of $75,000 in November.

SDSA has not yet received payment for the remaining balance as indicated above.  This is despite the fact that SDSA has sent numerous written communications by email and had multiple conversations with Bart Loethen, reminding Distributor of its obligations to pay the amounts owed.

Your good will is important to us, and we hope that we will not have to take any action that might jeopardize your credit standing or cause you added expense.

Therefore, if you provide us with a written payment plan signed by your CEO and CFO that, at the very least, commits Distributor to three monthly payments of $172,491.25 (i.e., one third of the remaining balance) over the next three months, we can offer to waive all accrued interest. The signed payment plan can be provided via email to folken.lee@samsung.com.

Please be advised that if you do not provide the requested payment plan or remit payment of the outstanding balance and accrued interest to SDSA by **__Friday, December 30, 2022__**, SDSA will take all

DocuSign Envelope ID: CF8CFCB7-04B2-4F26-B70D-8210E1642225

December 19, 2022
Page 2 of 2

available legal action against Distributor to recover the amounts owed and accrued interest, as well as legal fees and expenses incurred as a result of such legal action.

   This letter is without prejudice to any of our rights, powers, privileges, remedies, and defenses, now existing or hereafter arising, all of which are hereby expressly reserved. This letter (and any discussions we have had or may have about your payment default) is not, and shall not be deemed to be, a waiver of or a consent to any default now existing or hereafter arising under the Agreement. This letter shall not entitle you to any other or further notice or demand.

Sincerely,

DocuSigned by:

이 종 철

2089F98AEA684F6...

Jongchul Lee
Chief Financial Officer

SAMSUNG SDS   SAMSUNG